CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

12/28/2018
JULIA C. DUDLEY, CLERK
BY: S/J.Vasquez

DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| DANIEL C., | ) | |
| Plaintiff, | ) | Civil Action No. 5:17-cv-00074 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| NANCY A. BERRYHILL | ) | |
| Commissioner of Social Security, | ) | By:   Joel C. Hoppe |
| Defendant. | ) | United States Magistrate Judge |

Plaintiff Daniel C. asks this Court to review the Acting Commissioner of Social

Security's ("Commissioner") final decision terminating his disability insurance benefits ("DIB")

under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434. The case is before

me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the

parties' briefs and oral arguments, and the applicable law, I cannot find that substantial evidence

supports the Commissioner's decision. Accordingly, I recommend that the decision be reversed

and the case be remanded under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v.*

*Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

reviewing the merits of the Commissioner's final decision asks only whether the Administrative

Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports

the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*,

88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20 C.F.R. § 404.1505(a). A disabled person generally is entitled to benefits until he or she dies, reaches retirement age, or is no longer disabled. 20 C.F.R. § 404.316(b). The Commissioner must engage in periodic reviews of a claimant's disability to determine whether he remains entitled to benefits. *See* 42 U.S.C. § 421(i)(1); 20 C.F.R. § 404.1594(a). To make such a determination, the Commissioner asks, in sequence, whether the person: (1) is engaging in

2

substantial gainful activity; (2) has an impairment that meets or equals an impairment listed in the Act's regulations; (3) has experienced a "medical improvement" in the disabling impairment; (4) has experienced an improvement in his or her ability to work; (5) meets any "exceptions to medical improvement," if applicable; (6) still has a severe impairment; (7) can return to his or her past relevant work; and, if not, (8) can do other work that exists in the national economy. 20 C.F.R. § 404.1594(f); *see also Mullins v. Astrue*, No. 2:08cv4, 2008 WL 4642988, at *4 (W.D. Va. Oct. 21, 2008).

The fact that a person was once found to be "disabled" within the meaning of the Act does not give rise to a presumption that he or she remains disabled. 42 U.S.C. § 423(f) ("Any determination made under this section shall be made . . . without any initial inference as to the presence or absence of disability being drawn from the fact that the individual has previously been determined to be disabled."); *see also Rhoten v. Bowen*, 854 F.2d 667, 669 (4th Cir. 1988). Nonetheless, the Commissioner bears the burden "to show that a medical improvement has occurred and that the improvement relates to the claimant's ability to work." *Edwards v. Astrue*, No. 4:12cv5, 2012 WL 6082898, at *3 (W.D. Va. Dec. 6, 2012) (citing *Lively v. Bowen*, 858 F.2d 177, 181 n.2 (4th Cir. 1988)).

## II. Procedural History

Daniel C. was awarded DIB by Disability Determination Services ("DDS"), the state agency, which found Daniel C. disabled effective May 1, 2005, based on intellectual disability and organic mental disorders. *See* Administrative Record ("R.") 139.[1] The record of this finding

---

[1] During a hearing on August 7, 2008, an ALJ stated that Daniel C. had been awarded Supplemental Security Income ("SSI") in 2003. R. 45. The ALJ adjourned the hearing for thirty days to allow Daniel C. to consult with an attorney and update his medical records. *See* R. 43–57. At a subsequent hearing on February 18, 2009, Daniel C. was represented by counsel. R. 58–71. The ALJ again noted that Daniel C. was receiving a small SSI payment, and the ALJ wondered why the agency had denied his DIB claim, but was continuing to pay him SSI. R. 65–70. Unable to answer this question and observing that the case was

was subsequently lost. *Id.* In 2010, DDS conducted a continuing disability review ("CDR") and concluded that Daniel C.'s disability benefits should be continued. *See* R. 113, 117, 139, 612–41. This determination was based, at least in part, on the missing records from the original disability determination as well as a reviewing psychologist's findings that Daniel C.'s borderline intellectual functioning and major depressive disorder caused moderate restrictions in activities of daily living, moderate difficulties maintaining social functioning, and marked difficulties maintaining concentration, persistence, or pace. *See* R. 139, 247, 632, 638–41.

In 2014, DDS initiated a second CDR. *See* R. 229–46. Based upon this review, DDS concluded that Daniel C. had experienced medical improvement since his first CDR in November 2010, and that his benefits should therefore be terminated effective October 6, 2014. *See* R. 113–14, 118–20, 139. On April 6, 2016, Daniel C. appeared with counsel at an administrative hearing before ALJ Thomas W. Erwin and testified about his medical conditions and alleged functional limitations. R. 72–112. A vocational expert ("VE") also testified at the hearing. R. 108–10.

ALJ Erwin affirmed DDS's termination of Daniel C.'s benefits in a written decision issued on June 24, 2016. R. 17–40. He found that Daniel C. had not engaged in substantial gainful activity through October 6, 2014, but that he had experienced "medical improvement," which was related to his ability to work, since the November 8, 2010 decision finding that his disability continued. R. 22–25. ALJ Erwin also assessed Daniel C.'s residual functional capacity ("RFC") based on all of his medical impairments that existed "as of October 6, 2014." R. 25; *see* R. 26–34. He determined that Daniel C. could perform "light work" as defined in the

---

a "mess," the ALJ adjourned the hearing and returned the case to the field office to "try to figure it out." R. 70–71.

regulations,[2] except that he could only "occasionally climb, kneel, and crawl" and he could not operate foot controls. R. 25. Further, "[h]e was limited to simple, routine, unskilled tasks in a low-stress job, defined as having only occasional decision making . . . and changes in [the] work setting" and "no more than occasional interaction with others, including co-workers, supervisors, and the public." R. 25 (spelling and punctuation corrected). Based on this RFC finding, the ALJ concluded at step seven that Daniel C. could not perform his past relevant work as a lumber handler. R. 34. At step eight, however, the ALJ concluded that Daniel C.'s disability ended as of October 6, 2014, because he now could perform certain widely available "unskilled light" occupations, such as assembler, packing line worker, or housekeeper. R. 35. The Appeals Council denied Daniel C.'s request for review, R. 1–5, and this appeal followed.

### III. Discussion

Daniel C. asserts that the Commissioner's final decision is not supported by substantial evidence. First, he argues that the ALJ erred in finding medical improvement because he did not compare the severity of Daniel C.'s medical impairments with the severity of those same impairments as they existed at the time of the Comparison Point Decision ("CPD"), the most recent favorable disability decision. *See* Pl.'s Br. 11–13, ECF No. 15. Second, he argues that the ALJ erred in determining that his disability ended October 6, 2014, because the ALJ did not properly evaluate his mental impairments as they existed during the relevant time. *Id.* at 13–22. Third, he argues that the ALJ erred in assessing Daniel C.'s credibility regarding his statements about his symptoms. *Id.* at 22–25. Finally, he argues that the ALJ did not fully develop the

---

[2] "Light" work involves lifting no more than twenty pounds at a time, but frequently lifting objects weighing ten pounds. 20 C.F.R. § 404.1567(b). A person who can meet these modest lifting requirements can perform light work only if he also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1990).

record and should have ordered a consultative psychological examination. *Id.* at 25–26. The Court agrees that the ALJ erred at step three by failing to make an adequate comparison of Daniel C.'s current medical status with his status at the time of the CPD, and that this error warrants reversal and remand for further proceedings. Accordingly, this Report & Recommendation does not address Daniel C.'s other arguments.

A.    *Summary of Relevant Medical Evidence*

The Administrative Record before this Court is not only missing documents pertaining to Daniel C.'s initial disability determination from 2005, but also seems to contain significant gaps for other periods. Nevertheless, the Court summarizes below the evidence before it based on the materials that were included in the certified copy of the transcript of the related administrative proceedings. Certifications, ECF Nos. 9-1, 18-1; *see* 42 U.S.C. § 405(g).

1.    *Psychological Impairments*

In December 2010, Daniel C. appeared in the Augusta Health Care emergency department experiencing auditory and visual hallucinations. *See* R. 582–83. He reported having a physical and verbal altercation with his wife, and he was frightened that he might hurt himself or someone else. R. 583. He had been served with a warrant, initiated by his wife, to allow for a "cooling down period," and he was referred to an intensive outpatient program "by counselors on the Crossroads [M]ental Health Unit." *Id.* He participated in counseling several times each week from January 3, 2011, to February 2, 2011, and was thereafter discharged for program completion. *See* R. 582–95. At that time he reported that he was able to focus better and was more equipped to cope with challenges in his life. R. 583.

In March 2011, Daniel C. began therapy sessions with Barbara Finn, a licensed professional counselor with Augusta Behavioral Health. R. 596. He was diagnosed with mood

disorder and advised to attend therapy every two weeks. *Id.* He continued to see LPC Finn

through August 2011 with a range of complaints, including hallucinations, anxiety, lethargy, and

relationship issues with his wife. R. 596–602. Also during that time, he began visiting nurse

practitioners at Comprehensive Behavioral Health ("CBH") and voiced similar complaints. *See*

R. 580–81. Over the course of several visits to CBH, he was diagnosed with mood disorder,

psychosis, and major depressive disorder. *See* R. 572–81. Even with these diagnoses, CBH

practitioners always noted his behavior to be normal, his thought processes logical, and his

judgment fair and intact. *See id.* His mood fluctuated to some degree. *See id.*

On December 21, 2011, Daniel C. returned to LPC Finn complaining that "everything is

'happening again.'" R. 603. He had been out of psychotropic medication for two months and was

"hearing 'all sorts of things.'" *Id.* The next day, he had an appointment with Cindy Packer, a

Psychiatric and Mental Health Nurse Practitioner, and he reported experiencing auditory and

visual hallucinations, anxiety, and passive suicidal intentions. R. 572. He was prescribed anti-

depressant and anti-psychotic mediations. *Id.* In November 2012, Daniel C. continued his

therapy sessions with LPC Finn, noting that he had been out of his psychotropic medication for

at least five months and that he was experiencing visual hallucinations and "dysphoric grief"

following his father's recent death. R. 604–05. He was diagnosed with, among other things,

bipolar disorder with psychosis, *id.*, and he continued his therapy sessions with LPC Finn until

late June 2013. *See* R. 606–08.

In July 2013, Daniel C. sent a text message to his wife, which prompted the Rockbridge

Sheriff's Office to request a voluntary mental health consultation and crisis stabilization from

Rockbridge Area Community Services. R. 570. Daniel C. informed the clinician that he had

become upset with his father-in-law who had made a comment that evening about taking custody

of Daniel C.'s daughter. *Id.* Upon evaluation, the clinician observed that twenty-eight-year-old

Daniel C. "present[ed] as considerably younger than his stated age with an affect appropriate for

a younger child" and that his speech was "jilted." *Id.* (spelling corrected). There is no indication

that the providers took any further action, as Daniel C. specifically denied "suicidal/homicidal

ideation, plan, or intent." *Id.* A few days later, Daniel C. returned "in crisis," reporting that he

was "tired of fighting" and that he was "ready to quit." R. 571. He claimed that he had thought

several times about injuring himself by driving his car into a tree and that he was experiencing

passive homicidal ideation without a plan to harm his wife. *Id.* He was later voluntarily admitted

to rehabilitation at Carillion Clinic under the services of Justin B. White, M.D. R. 489. He was

noted to have been off of his psychotropic medications for six months to one year. *Id.*

On the following day, Daniel C. described to Dr. White his complaints about becoming

more agitated and concerns that he might impulsively hit his wife. R. 489. He also reported

seeing "black reapers," which he "attribute[ed] to somebody monitoring him." *Id.* He indicated

that he hears voices coming from a distance and talking among themselves, and he further

admitted to feeling paranoid. R. 490. Dr. White noted a prior psychiatric hospital admission in

2010 and "detect[ed] symptoms suggestive of psychosis" during their conversation. R. 489. On

exam, Dr. White found Daniel C. to be pleasant, calm, and in "no distress even in relation to the

psychotic experiences" he was describing. R. 491. He found that Daniel C.'s thought process was

"largely linear" and "goal directed," but that his thought content was marked by "persecutory

delusions" and lack of insight. *Id.* (capitalization altered). He also found Daniel C. to be alert,

oriented, and with a good attention span. *Id.* Dr. White opined that Daniel C. was "relapsing into

an episode of his underlying mental illness," which he suspected was "of a psychotic nature." R.

492; *see also* R. 493 (describing Daniel C.'s presentation as a "high complexity" "severe

exacerbation of illness [and] abrupt change in neurological status"). Daniel C. was voluntarily

admitted to the hospital and monitored every fifteen minutes, and he attended therapy sessions

and began a course of the antipsychotic drug Olanzapine. R. 492, 496. He remained in

rehabilitation until July 15, 2013, at which time he was discharged in stable condition and

prescribed psychotropic medications. R. 496.

In January 2014, Daniel C. visited Hasnain Maqsood, M.D. R. 323–25. He reported

feeling sad, depressed, hopeless, and helpless and noted two prior psychiatric hospitalizations. R.

323. He also reported relationship issues with his wife. R. 324. On exam, Dr. Maqsood found

Daniel C. to have normal speech; logical and goal-directed thought process; "satisfactory"

attention, memory, recall, and fund of knowledge, but "decreased" concentration; and "fair

insight and judgment into his mental health issues." *Id.* Daniel C. did not report any active

suicidal or homicidal ideations, thoughts, or plans. Dr. Maqsood diagnosed Daniel C. with

bipolar disorder, anxiety disorder, partner relationship issues, a learning disorder, and

psychosocial stressors. *Id.* Daniel C. followed up monthly with Dr. Maqsood until early June

2014; during this period his symptoms fluctuated in severity. R. 315–22.

2.    *Right Knee Injury*

In 2006, Daniel C. injured his right knee while working at a lumber yard. *See* R. 312. He

received conservative treatment of physical therapy and anti-inflammatory medication, and his

condition improved within a few months to the point that he was "essentially asymptomatic." *Id.*

In November 2013, he visited the LewisGale Alleghany emergency room with an injury to his

knee that he incurred while walking. R. 384. No imaging was performed on his knee at the time,

but his record does mention that he had previously visited another emergency department and

received negative X-rays. *Id.* He was diagnosed with a knee sprain and discharged. R. 385.

In January 2014, Daniel C. underwent an arthroscopic plica resection on his right knee.
R. 301. During surgery, he was found to have a dense medial shelf and a remote tear of the
posterior cruciate ligament ("PCL"). *Id.* He later followed up with surgeon Clare Weidman,
M.D., who noted that his PCL tear was a chronic condition and that he reported being in "a fair
amount of pain." *See* R. 305–08. In March 2014, Daniel C. reported daily symptoms associated
with his knee, and Dr. Weidman referred him to James Farmer, M.D., for his opinion and
"possible recommendation for surgical intervention." *See* R. 312–13.

On April 4, Daniel C. visited Dr. Farmer complaining of chronic instability and
"intermittent sharp, stabbing pain" in his right knee. R. 556. He rated the pain nine out of ten and
said it was exacerbated by sitting, standing, walking, running, squatting, pivoting, and climbing
stairs. *Id.* On exam, Dr. Farmer noted that Daniel C.'s knee revealed no effusion, but that he did
"have guarded motion and exaggerated pain responses." R. 557. Dr. Farmer assessed right knee
posterolateral cruciate ligament insufficiency and chronic right knee pain. *Id.* He noted that
Daniel C. had not been to physical therapy for this injury and that he would not perform a
ligament reconstruction without assurances that he would thereafter attend physical therapy. *Id.*
He declined Daniel C.'s request for narcotic pain medications. *Id.*

In January 2015, Daniel C. visited the Bath Community Hospital emergency department
with complaints of knee pain that was not controlled by medication. R. 539–44. An X-ray of his
knee "essentially look[ed] normal," and he was advised to visit a family doctor or orthopedist for
further evaluation. R. 540. He was diagnosed with recurrent knee pain with chronic ligamentous
injury. *Id.* He returned to the hospital in November 2015 complaining of right groin pain
radiating into his right flank, which had developed after cutting firewood the previous weekend.

R. 502. The record also mentioned chronic ligament pain in his right knee that he had been

"advised to have repair[ed] but feared having [a] cadaver tendon replacement." R. 502.

In February 2016, Daniel C. returned to Dr. Farmer complaining of right knee pain and

instability. R. 560. Dr. Farmer noted that Daniel C. "was unable to undergo surgery for various

[in sundry] reasons" and that he is currently reporting buckling, popping, catching, and swelling.

Dr. Farmer indicated that Daniel C. had "obvious posterior cruciate ligament instability, possibly

anterior cruciate ligament instability, and interval possible meniscal pathology." *Id.* Normal X-

ray results were also obtained, but the results are noted for the *left* knee, R. 561, which may be a

typographical error.

### 3.   *Neck, Back, and Shoulder Pain*

On April 2, 2013, Daniel C. visited the LewisGale Alleghany emergency department

complaining of neck pain that was not associated with any injury. *See* R. 407–18. On exam, his

neck and back were found to be normal except for some mild muscle spasm near the base of the

neck. R. 408. He was diagnosed with acute neck pain and discharged in stable condition with a

temporary work-release note and a prescription for narcotic pain medication. R. 408, 413, 417. In

July, he returned to the emergency department complaining of right shoulder pain that had been

ongoing for several months after a fall. R. 402. An X-ray taken of his right shoulder was normal.

R. 406. In November 2013, he again visited the emergency department complaining of flank pain

R. 380–85. On exam, his neck, back, and knee appeared to be normal, R. 382, and he was

diagnosed with low back pain, R. 383.

In June 2014, Daniel C. returned again to the emergency department with complaints of

mid-back pain and right shoulder pain resulting from a fall the previous day. R. 348. On exam,

his right shoulder was found to have a mildly decreased range of motion and some tenderness,

and his back was found to have some mild pain with range of motion. R. 349. X-rays of his right

shoulder and thoracic spine showed no abnormalities, and he was diagnosed with multiple

contusions resulting from a fall. R. 350, 352–53. That July, Daniel C. visited the emergency

department reporting a right shoulder injury from pulling on a lawn mower. R. 344. He also

reported having a history of problems with his right shoulder. *Id.* On exam, he was found to be

unable to abduct his shoulder more than 90 degrees, and he reported that rotation caused pain. R.

345; *see also* R. 344. His muscles were also found to be "diffusely tender." R. 345. He had

normal range of motion and no deformity, *id.*, and he was diagnosed with a right shoulder sprain,

R. 346.

In April 2015, Daniel C. visited the emergency department with left shoulder pain and a

minor hand laceration resulting from a recent fall. R. 477. A left shoulder X-ray showed no

fracture or dislocation, but possible mild widening of the acromioclavicular joint. R. 479. He was

diagnosed with a hand laceration and a shoulder sprain or strain. *Id.* On August 3, 2015, he

returned to the hospital complaining of back and left wrist pain from having fallen off of a truck

in a work-related incident two months earlier. R. 481. An X-ray of his lumbar spine showed no

acute fracture subluxation, but some mild lower lumbar spondylosis. R. 487.[3] He had full range

of motion without pain or tenderness in the lumbar spine. R. 483. He was diagnosed with low

back pain and a wrist strain.

Finally, in February 2016, Daniel C. visited the hospital for evaluation following a motor

vehicle accident from which he was experiencing progressive pain in his cervical, thoracic, and

lumbar spine. R. 563. Though some tenderness was noted in his back and neck, no significant

---

[3] The record also contains an additional lumbar spine X-ray taken on August 12, 2015, showing "no acute osseous abnormality." R. 485. Though the reason for exam is listed as "injury back pain" it is unclear what injury prompted this exam.

abnormalities were identified on exam. R. 565. He was diagnosed with a cervical and lumbar

strain. R. 567.

B       *Medical findings and opinions from initial CDR*

    *1.    2007 Consultative Examination by Dr. Worth*

      In August 2007, James W. Worth, Ed.D., administered an intelligence test and mental

status evaluation for Daniel C. pursuant to a referral from DDS. *See* R. 642. Dr. Worth noted that

Daniel C. was "oriented in all spheres" and that his speech was "rational and coherent." R. 652.

He further found Daniel C. to be "alert, appropriate, cooperative, and amiable." *Id.* Daniel C.'s

thinking was logical and linear, and his "judgment and insight were normal and commensurate

with his level of intelligence." *Id.* Daniel C. informed Dr. Worth that he had "experienced

auditory hallucinations in the past, but not for a year or more." *Id.* (punctuation corrected).

Ultimately, Dr. Worth "found no evidence of truly delusional thought, actual bizarreness of

thought content, ideas of reference, looseness of associations or mania." *Id.*

      With respect to the intelligence test, Dr. Worth found that Daniel C. was "operating at the

top of the Dull Normal Range of Intelligence with a Verbal IQ of 86, a Performance IQ of 94,

and a Full Scale IQ of 89." R. 653. Daniel C. did receive "remarkably low" scores on the Digit

Span and Digit Symbol tests, which "suggest[ed] that concentration and attention problems [had]

markedly reduced the claimant's intellectual efficiency." *Id.*

      Dr. Worth also noted that "[n]o records of any kind were made available to me and the

claimant's report, which was sketchy and incomplete, is all I have to go on. Nevertheless,

[Daniel C.] may have had an Attention Deficit/Hypersensitivity Disorder. I am reluctant to make

this diagnosis on the basis of his report alone." R. 654. Dr. Worth found that Daniel C. "is not

[intellectually disabled] and certainly has normal intellectual potential." *Id.* He opined that

Daniel C.'s prognosis was "fair to good" and that he "should be able to handle most simple, repetitive tasks rather easily and at least some that require normal ability to deal with detail and complexity." R. 655.

2.    *2010 Consultative Examination by Dr. Cianciolo*

Daniel C. was again referred for a psychological consultative examination in March 2010 to Joseph J. Cianciolo, Ph.D. *See* R. 662–64. On examination, Dr. Cianciolo found Daniel C. to be alert and fully oriented, but mildly anxious. R. 663. He found Daniel C.'s thoughts to be "logical and goal directed" and insight and judgment to be "developed at a level commensurate with his overall level of intelligence." *Id.* With respect to his intelligence, Dr. Cianciolo noted that Daniel C. was "most likely functioning within the borderline range," but that "[m]emory processes appear to be grossly intact." *Id.*

Dr. Cianciolo opined that although Daniel C. seemed "capable [of] performing simple and repetitive tasks, . . . [his] ability to perform detailed and complex tasks appear[ed] to be markedly impaired as a function of cognitive deficits." *Id.* He found mild impairment in Daniel C.'s "ability to maintain regular attendance in the workplace, perform work activities on a consistent basis, and complet[e] a normal workday or workweek without interruption from [his] psychiatric condition," and moderate impairment in "[h]is ability to interact with coworkers and the public as well as coping with routine stressors encountered in competitive work." R. 663–64. He noted, however, that it was unlikely Daniel C. would need additional supervision "provided that the tasks are simple and concrete." R. 663.

3.    *Findings by Disability Determination Services*

In April 2010, Nicole Sampson, Ph.D., reviewed Dr. Cianciolo's consultative examination report, which is the only medical record that she referenced, as part of the first

CDR. *See* R. 612–41. Based on her review, she concluded that Daniel C. had medically determinable impairments of "single episode," "mild" Major Depressive Disorder, Borderline Intellectual Functioning, and Nocturnal Myoclonic Jerks, R. 640, which did "not precisely satisfy the diagnostic criteria" in the relevant Listings, *see* R. 612–14, 619, 634. She noted, however, that this case involved "a lost folder" and that the Social Security Administration's Program Operations Manual System ("POMS") instructs that the agency reviewers "should always allow" benefits to continue "when there is no CPD in [the] file" even "if the claimant does not have a significant problem." R. 640. Nevertheless, Dr. Sampson also discussed Daniel C.'s March 2010 consultative examination and concluded that he "would be unable to function in a competitive work environment" and that restrictions resulting from the impairments are such that the claimant would be unable to meet the basic mental demands of competitive work on a sustained basis." R. 641.

On November 8, 2010, DDS continued Daniel C.'s disability benefits. R. 117.

C.    *Medical findings and opinions from second CDR*

In 2014, DDS initiated the present CDR. Daniel C. identified his medical conditions as right knee problem, learning disability, and bipolar/psychotic episodes. R. 232. That September, Howard S. Leizer, Ph.D., reviewed Daniel C.'s submissions to the agency and his medical records for DDS. Dr. Leizer noted that Daniel C. had a learning disorder, an anxiety disorder, and bipolar disorder. R. 420, 422, 424. Regarding Daniel C.'s RFC assessment, Dr. Leizer found Daniel C. to have moderate limitations in his abilities to carry out detailed instructions, maintain attention and concentration for extended periods, and interact appropriately with the general public. R. 433–34. Based on these findings, he concluded that Daniel C. had the ability "to perform simple routine work tasks requiring no more than occasional interaction with the general

public." R. 435. Before making this assessment, Dr. Leizer noted that Daniel C. had an original onset date of August 2006, but that his "past history with [the Social Security Administration] . . . is not fully understood" because complete records of his prior disability filings and the agency's fully favorable determinations had been lost or destroyed. R. 431.

On June 25, 2015, Daniel C. appeared with counsel before K. Lawrence, a Disability Hearing Officer ("DHO") and testified regarding his claim for continuing disability. *See* R. 137, 138–39. A transcript of this hearing is not contained in the record, but DHO Lawrence summarized Daniel C.'s purported testimony in his written decision. R. 139. On August 12, 2015, DHO Lawrence issued a written decision finding that Daniel C. was no longer disabled. R. 138–45. DHO Lawrence summarized much of the available evidence from the record, including treatment notes, exam findings, medical opinions, and Daniel C.'s statements to both healthcare professionals and at the disability hearing. *See id.* With respect to his medical improvement analysis, the DHO found that Daniel C.'s "mental health symptoms have improved and [he] is able to take care of his activities of daily living, concentrate, and interact with others." R. 140. In reaching this conclusion, he compared 2014 findings from visits to Dr. Masqsood with the results from Dr. Worth's August 2007 evaluation and Dr. Cianciolo's March 2010 assessment. R. 140. The DHO did not cite any records upon which Drs. Worth or Cianciolo relied nor did he identify any other pre-CPD records.

DHO Lawrence also evaluated Daniel C.'s RFC. He found that at the time of the CPD, which he defined as April 8, 2010, *see* R. 139, Daniel C. was "restricted to less than a full range of simple and unskilled work," but that at the time of his hearing decision, Daniel C. could "perform light, unskilled work," R. 143. The DHO noted that Daniel C. still had a severe impairment. R. 143. The DHO found that Daniel C. now had the RFC "for a wide range of

16

unskilled light work" and that Daniel C. would be able to perform certain jobs, including a

Ticketer, a Folder, and a Marker. R. 144–45.

D.      *Analysis*

Daniel C. first argues that ALJ Erwin erred at the step of analyzing medical improvement

by failing to adequately compare the evidence of his medical condition and limitations at the

time of the CPD with evidence from the time of cessation. Pl.'s Br. 11–13. "Medical

improvement is any decrease in the medical severity of [the claimant's] impairment(s) which

was present at the time of the most recent favorable medical decision that [the claimant was]

disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1). In order to determine whether

medical *improvement* occurred, the ALJ may not simply rely on the *current* medical evidence,

*see Byron v. Heckler*, 742 F.2d 1232, 1236 (10th Cir. 1984) (explaining that no adequate finding

of medical improvement can be reached by focusing only on the current evidence of disability)

(citing *Vaughn v. Heckler*, 727 F.2d 1040 (11th Cir. 1984))), but must "compare the current

medical severity of that impairment(s) which was present at the time of the [CPD] to the medical

severity of [the] impairment(s) at [the] time [of alleged improvement]," 20 C.F.R. §

404.1594(b)(7). *See also Marcelin v. Berryhill*, Civ. Action No. 16-14075, 2017 U.S. Dist.

LEXIS 146582, at *12 (E.D. La. Aug. 15, 2017), *adopted by* 2017 U.S. Dist. LEXIS 145599

(E.D. La. Sept. 8, 2017). Nor is it sufficient for the ALJ to provide a mere summary of earlier

records, *see Smith v. Berryhill*, No. 16cv9976, 2018 U.S. Dist. LEXIS 97365, at *14–15 (N.D.

Ill. June 11, 2018) (citing *Veino v. Barnhart*, 312 F.3d 578, 587 (2d Cir. 2002)), or to summarily

rely on the reports or opinions of others, *see Medina v. Colvin*, No. 14cv01967, 2015 U.S. Dist.

LEXIS 125164, at *35 (N.D. Cal. Aug. 21, 2015). Instead, "[a] proper finding of medical

improvement requires examination of reports and records generated before the CPD." *Huerta v.*

*Colvin*, No. CV-16-04206, 2017 U.S. Dist. LEXIS 203398, at \*9 (C.D. Cal. Dec. 11, 2017). The Court agrees that ALJ Erwin failed to satisfy these standards.

At step three, ALJ Erwin found that Daniel C. had experienced medical improvement as of October 6, 2014. R. 24. He found that at the time of the CPD on November 8, 2010, Daniel C. had determinable mental impairments of borderline intellectual functioning and major depressive disorder. R. 22. He noted, however, that "[p]sychiatric treatment notes leading up to the cessation date" indicated that Daniel C. "was not responding to any internal stimuli and was improving with treatment. . . ." R. 24. He further noted that in June 2014, Daniel C. was deemed to have "satisfactory" attention, concentration, immediate retention, recall, and recent and remote memory, *id.* (citing R. 315), and that "[h]e did not seek treatment for problems with concentration, persistence, or pace after the cessation date," *id.* ALJ Erwin also referenced testimony by Daniel C. from the administrative hearing where Daniel C. referred to repair work he performed with his father-in-law in 2014 as requiring "a lot of brainpower." R. 24–25 (citing R. 96). Based on this evidence, ALJ Erwin concluded that although Daniel C. "had a marked limitation in concentration, persistence, or pace at the CPD, the record does not support such a limitation since the cessation date. Accordingly, medical improvement occurred." R. 25.

In reaching this conclusion, ALJ Erwin relied almost exclusively on medical records from Daniel C.'s January to June 2014 visits to Dr. Maqsood. *See* R. 23–24. ALJ Erwin, however, did not specifically compare these findings to any medical records or other documents existing prior to the CPD. *See Huerta*, 2017 U.S. Dist. LEXIS 203398, at \*9 ("A proper finding of medical improvement requires examination of reports and records generated before the CPD."). Moreover, while ALJ Erwin found that medical improvement occurred with respect to Daniel C.'s "marked limitation in concentration, persistence, or pace," R. 25, he did not find

improvement with other noted CPD limitations, such as "borderline intellectual functioning" or "major depressive disorder," R. 22. The ALJ also did not identify Daniel C.'s Nocturnal Myoclonic Jerks, an impairment specifically noted by Dr. Sampson in the November 2010 CPD. R. 640; *see Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ( "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding."). Accordingly, ALJ Erwin's medical improvement analysis is deficient in that it does not actually compare the medical evidence of Daniel C.'s condition at the time of the CPD to the current severity of his condition. *See* 20 C.F.R. § 404.1594(b)(7).

The Commissioner argues that the ALJ did make an adequate comparison by citing to pre-CPD reports from Drs. Worth, Cianciolo, and Sampson. Def.'s Br. 10, ECF No. 22. ALJ Erwin did cite these records as part of his step two analysis. He noted findings from Dr. Worth of Daniel C.'s "low to average intelligence" and findings from Dr. Sampson that Daniel C. experienced "marked limitations in concentration, persistence, or pace. . . ." R. 24. Mere references to other people's reports or opinions, however, "cannot substitute for the ALJ's own obligation . . .  [to] compare prior to current medical evidence." *Medina*, 2015 U.S. Dist. LEXIS 125164, at *35 (citing 20 C.F.R. § 404.1594(b)(1)). The ALJ does not perform an adequate medical improvement analysis by simply summarizing records from prior to the CPD. *See Smith*, 2018 U.S. Dist. LEXIS 97365, at *15 ("It is worth noting that courts in other jurisdictions have remanded on this basis even where, as here, some of the earlier records were otherwise summarized in the current record."). Here, ALJ Erwin identified only some of the ultimate findings from prior reports rather than undertaking a fulsome discussion of the relevant medical

evidence as to Daniel C.'s condition at the time of the CPD, such as his particular symptoms or

functional limitations.

Furthermore, the agency's Notice of Disability Cessation dated October 6, 2014, provides

a list of medical "evidence [that] was used in the determination of 11/08/2010 to show [Daniel C.

was] disabled," R. 118–19, but aside from Dr. Cianciolo's and Dr. Worth's evaluations, none of

the cited medical evidence is in the administrative record. ALJ Erwin did not cite to or reference

any of these other medical records. *Huerta*, 2017 U.S. Dist. LEXIS 203398, at *9 ( explaining

that a proper medical improvement analysis "requires examination of reports *and records*

generated before the CPD" (emphasis added)); *see also Senior v. Colvin*, No. 3:12cv589, 2013

U.S. Dist. LEXIS 127438, at *14 (M.D. Fla. Aug. 5, 2013) ("Without any of the original medical

evidence, it was impossible for the ALJ to properly compare the evidence and evaluate whether

there had been medical improvement."), *adopted by* 2013 U.S. Dist. LEXIS 127432 (M.D. Fla.

Sept. 6, 2013). In fact, none of Daniel C.'s pre-CPD medical records were even included in the

administrative record, and it appears that most of these records were lost or destroyed. *See* R.

431, 640. The regulation governing CDRs contains a specific provision for lost files. It states, in

pertinent part:

> If the prior file cannot be located, we will first determine whether you are able to
> now engage in substantial gainful activity based on all your current impairments. .
> . . If you are able to engage in substantial gainful activity, we will determine
> whether an attempt should be made to reconstruct those portions of the missing
> file that were relevant to our most recent favorable medical decision (e.g., work
> history, medical evidence from treating sources and the results of consultative
> examinations). This determination will consider the potential availability of old
> records in light of their age, whether the source of the evidence is still in
> operation; and whether reconstruction efforts will yield a complete record of the
> basis for the most recent favorable medical decision. If relevant parts of the prior
> record are not reconstructed either because it is determined not to attempt
> reconstruction or because such efforts fail, *medical improvement cannot be found*.
> The documentation of your current impairments will provide a basis for any
> future reviews.

20 C.F.R. § 404.1594(c)(3)(v) (emphasis added).

Here, ALJ Erwin's decision did not address the effect of these lost records on Daniel C.'s possible entitlement to continuing disability. To adhere to the regulations that govern these circumstances, ALJ Erwin was required to assess whether "an attempt should [have been] made to reconstruct those portions of the missing file that [were] relevant to [the Commissioner's] most recent favorable medical decision. . . ." 20 C.F.R. § 404.1594(c)(3)(v); *see also Hallaron v. Colvin*, 578 F. App'x 350, 353–54 (5th Cir. 2014) (vacating the termination of benefits and remanding for the Commissioner to determine whether the pre-CPD file should  be reconstructed). This does not necessarily mean that the agency will need to reconstruct missing files regarding Daniel C.'s original disability determination from 2005 or 2006. It does mean, at a minimum, however, that medical records and any other opinions or findings relied upon in reaching the November 8, 2010 CPD will need to be located and included in any future administrative record in order to make an adequate comparison between those records and the medical evidence of Daniel C.'s medical conditions at the time the agency terminated his disability benefits. *See Smith v. Comm'r of Soc. Sec.*, No. 3:16cv212, 2017 U.S. Dist. LEXIS 79647, at *7–8 (N.D. Miss. May 24, 2017) ("The prior medical evidence is so vital to a finding of medical improvement that agency regulations preclude such a finding when the file upon which the claimant's most recent favorable determination of benefits was based cannot be found and is not reconstructed."). If such records cannot be located or reconstruction is otherwise not attempted, medical improvement cannot be found and Daniel C.'s benefits may not be terminated on the basis of the 2014 CDR. *See id.* at *9.

IV. Conclusion

Case 5:17-cv-00074-MFU-JCH   Document 27   Filed 12/28/18   Page 22 of 22
Pageid#: 802


For the foregoing reasons, I cannot find that substantial evidence supports the Commissioner's final decision. Accordingly, I respectfully recommend that the presiding District Judge **GRANT** Daniel C.'s Motion for Summary Judgment, ECF No. 14, **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 21, **REVERSE** the Commissioner's final decision, **REMAND** the case for further administrative proceedings under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** the case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Michael F. Urbanski, Chief United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to counsel of record.

ENTER: December 28, 2018

Joel C. Hoppe
United States Magistrate Judge

22